UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANK ALAMPI,

      Plaintiff,                        Case No. 14-cv-11910
                                         Hon. Matthew F. Leitman

v.

CENTRAL STATES SOUTHEAST,
SOUTHWEST AREAS PENSION FUND

      Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (ECF #9) AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF #10)

## INTRODUCTION

In this action, Plaintiff Frank Alampi ("Alampi") claims that Defendant Central States Southeast, Southwest Areas Pension Fund (the "Fund") breached the terms of an employee benefit plan when it rejected his application for retirement benefits. Alampi has moved for summary judgment, and the Fund has moved for judgment on the administrative record. For the reasons discussed below, the Court **GRANTS** the Fund's Motion for Judgment on the Administrative Record (ECF #9) and **DENIES** Alampi's Motion for Summary Judgment (ECF #10).

1

## RELEVANT FACTUAL BACKGROUND

**A.     Central States' Pension Fund Trust Agreement and Plan Document**

The Fund is a multi-employer employee pension benefit plan subject to the requirements of the Employment Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001 *et seq*.  It is funded primarily by "contributing employers" who make contributions to the Fund on their employees' behalf.  (*See* ECF #12-2 at § 1.08(a), Pg. ID 1272.)

The Fund is, in essence, "governed" by two documents: the Central States Pension Plan Document (the "Plan," ECF #12-2) and the Central States Pension Fund Trust Agreement (the "Trust Agreement," ECF #12-1).  The Plan defines the various pension benefits that are available to eligible employees, explains how credit is earned towards those pension benefits, and outlines an administrative appeal process that can be used if a claim for benefits is initially denied.  (*See generally* the Plan.)  The Trust Agreement grants to the Fund's Trustees the "authority to control and manage the operation and administration" of the Fund (the Agreement at 10, Pg. ID 1254), and it gives the Trustees discretionary power and authority to decide claims for benefits and construe the terms of the Plan (*see id.* at 18, Pg. ID 1259).

In order to qualify for pension benefits under the Plan, an individual must be, among other things, an "employee" as defined by the Plan.  The Plan defines an

2

"employee" in relevant part as "an individual who is employed for 30 days by a Contributing Employer under the terms and conditions of a Collective Bargaining Agreement which requires that Employer Contributions be made to the Pension Fund, except that, any individual who is self-employed … shall not be an Employee for purposes of this Pension Plan." (*Id.* at § 1.14(a)(1), Pg. ID 1279.) The Plan further provides that if there is a dispute about whether a claimant for benefits qualifies as an "employee," then "[t]he common law test or applicable statutory definition of master-servant relationship shall be used" to determine whether the claimant qualifies as an "employee." (*Id.* at § 1.14(b), Pg. ID 1280.)

In order to be eligible for pension benefits under the Plan, an employee must have earned a sufficient number of "service credits."  Employees may earn service credits in different ways.  For example, an employee may earn "contributory service credits" based in part upon the length of time he worked for an employer during a time in which the employer was making contributions to the Fund on his behalf. (S*ee* the Plan at §§ 1.09-1.10, Pg. ID 1274-1278.)  An employee may also earn "non-contributory service credits" in certain circumstances for work performed in the absence of an employer contribution to the Fund – such as for work performed as an employee before an employer joined the Fund.  (*See id.* at §§ 1.21-1.22, Pg. ID 1283-1285.)

3

Finally, when a claimant applies for pension benefits, "[t]he burden of proof in demonstrating eligibility for any benefit…[is] the responsibility of the claimant." (*Id.* at Appendix B(a)(3), Pg. ID 1290.)  If the Fund initially denies a claim for pension benefits, the Plan allows the claimant to appeal that decision to the Fund's Trustees through a two-step appellate process. (*See id.* at Appendix B, Pg. ID 1290-1293.)

**B.    The Fund Initially Confirms Alampi's Eligibility for Pension Benefits**

Alampi worked as a truck driver at various times from at least 1961 to 1997, and multiple companies made pension contributions to the Fund on his behalf over the course of those years.  (*See* January 16, 2007, Minutes of the Pension Trustee Appeal Review Committee (the "Minutes"), ECF #12-3 at 1, Pg. ID 1295.)  At various times in the late 1990s and early 2000s, Alampi submitted inquires to the Fund about his benefits, and each time the Fund responded that he had earned 14.3 years of "contributory service credit."  (*See* Correspondence, ECF #12-6 at 34-42, Pg. ID 1463-1471.) The Fund repeatedly informed Alampi that, based on this 14.3 years of service credit, he had "met the requirements for a Vested Pension."  (*Id.*) However, each time the Fund told Alampi that he had earned 14.3 years of service credit and had thus qualified for a "Vested Pension," it also told Alampi that this figure was based on "current information" and that his "eligibility" could "change

4

if [the Fund found] additional or conflicting information." (*See* Correspondence, ECF #12-6 at 34-42, Pg. ID 1463-1471.)

Alampi's 14.3 years of qualifying service included 7.5 years of "contributory service credit" based upon his work with J & J Cartage Company ("J & J") from 1965-1974. (*See* the Minutes at 1, Pg. ID 1295.) It is undisputed that during this time frame (1) Alampi performed trucking services for J & J and (2) J & J made contributions to the Fund on Alampi's behalf. At the time J & J was making its contributions on Alampi's behalf, the Fund believed that Alampi was a J & J "employee" as defined by the Plan, and, thus, that Alampi was entitled to service credit for these years that he worked with J & J.

## C.   Following a Request by Alampi for Increased Service Credits, The Fund Investigates Alampi's Employment History and Pension Eligibility

In 2002, Alampi requested that the Fund consider whether he was entitled to additional years of service credit for work that he performed for J & J between January 1961 and August 1965 (the "Additional J & J Years"). (*See* the Minutes at 2, Pg. ID 1296.) J & J did not participate in the Fund during the Additional J & J Years, so it did not make contributions to the Fund on Alampi's behalf during that time. Alampi therefore sought "non-contributory service credits" related to this period of work for J & J. (*See id.*) Alampi believed that once the Fund granted him these "non-contributory service credits," he would be eligible for a more-generous pension when he retired.

5

In response to Alampi's request, the Fund began investigating Alampi's employment history with J & J.  Among other things, the Fund requested and reviewed Alampi's "earnings report" from the Social Security Administration for all of the years Alampi worked for J & J.  The Fund told Alampi that the report did not "show any wages from J&J Cartage for 1961 through 1965." (ECF #12-6 at 21, Pg. ID 1450.)  It appears that the Fund therefore concluded that Alampi was not an "employee" – as defined by the Plan – during the Additional J & J Years, and that, accordingly, he did not qualify for any additional service credits for work performed during those years.  (*See id.*)

The earnings report also raised serious questions for the Fund about whether Alampi was entitled to service credit for *any* of his years worked at J & J – including years for which the Fund had previously given Alampi credit (i.e., 1965-1974).  The Fund told Alampi that his earnings report showed that he was self-employed, rather than working as an employee of J & J, from 1963-1968 and 1971-1973. (*See id.*)   If Alampi was working for J & J as a self-employed, independent contractor during these years, then pursuant to the terms of Plan, he would not be entitled to credit for that service. (*See* the Plan, § 1.14, Pg. ID 1279.) And if Alampi was not entitled to credit for these years, then it was possible that he would not be entitled to any pension benefits at all from the Fund.

6

Based upon the information in the earnings report, the Fund decided to take a closer look at whether Alampi was an "employee" of J & J or whether he performed trucking services for J & J as a self-employed independent contractor. On November 19, 2004, the Fund asked Alampi to complete an "Owner-Operator Questionnaire [(the "Questionnaire")] in regard to his entire period of employment with J&J Cartage." (ECF #12-6 at 5, Pg. ID 1434.) The Fund explained that Alampi's responses on the Questionnaire would help "determine if he was working in an employee status" for J & J or whether he was a self-employed, independent contractor. (*Id.*) For example, the Questionnaire asked Alampi to provide information concerning, among other things, his method of compensation, who paid his Social Security withholding taxes, whether he filed his taxes as a self-employed individual, who had the power to discipline him, and who paid for his business expenses. (*See* ECF #12-3 at 16-22, Pg. ID 1309-1315.)

The Fund also asked Alampi to "establish proof of [] employment" by providing "copies of any contemporaneous documentation, such as contracts or lease agreements, paycheck stubs, logbooks, etc. something that [would] prove[] his employment with J&J Cartage during the years [] identified on the earnings report [as self-employed]." (ECF #12-6 at 5, Pg. ID 1434.)

7

**D.      Alampi Provides Additional Information Related to his Employment with J & J**

In December 2004, Alampi, who was represented by counsel, submitted his completed Questionnaire to the Fund.  Some of Alampi's responses appeared to indicate that he had an independent contractor relationship with J & J.  For example, Alampi said that he was not paid an hourly wage or salary but was, instead, "paid according to a percentage of the revenue."  (ECF #12-3 at 18, Pg. ID 1331.)  And, while J & J employees were paid under a two-check system – one check for wages and another for equipment – Alampi disclosed that he did *not* "receive separate checks for wages and equipment."  (*Id.*)  Alampi further confirmed that he filed "reports" and "income returns as a self-employed individual."  (*Id.* at 19 Pg. ID 1312.)

However, some of Alampi's other responses indicated that he may have been a J & J employee.  For instance, Alampi responded that he worked exclusively for J & J from 1961-1974, that J & J had the power to fire and discipline him, that J & J's logo appeared on his truck, and that J & J determined the hours he worked and routes he drove.  (*Id.* at 18-22, Pg. ID 1312-1315.)

**E.      Alampi Applies For Retirement Benefits and the Fund Denies His Application**

At the same time Alampi provided the Fund additional information related to his work with J & J, he filed an application for pension benefits.  (*See* ECF #12-5

8

at 36-38, Pg. ID 1420-1422.) Based upon its additional investigation into Alampi's

employment with J & J, the Fund formally denied Alampi's application for

benefits on August 12, 2005.  (*See* ECF #12-5 at 16-18, Pg. ID 1400-1402.)   In

correspondence to Alampi's attorney, the Fund explained that it "reject[ed]

[Alampi's] claim because he had not established eligibility for a pension with [the]

Fund."  (*Id.* at 16, Pg. ID 1400.)  The Fund went on to say that:

> According to our records, [A]lampi joined the Central
> States Pension Fund in August 1965; however, when
> [we] reviewed his Social Security Report of Earnings for
> his employment at J&J Cartage there was no wages
> reported for this employment until 1972 [].   There are
> wages reported for self-employment for years he was
> employed at J&J Cartage.   Therefore, as you were
> advised in our letter dated July 5, 2005 it does not appear
> that the pension contributions we received from 1965
> through 1971 are proper as [Alampi] was not working
> under the terms of the Collective Bargaining Agreement.
>
> When a member is working as an owner operator under
> the terms of a Collective Bargaining Agreement, he is
> paid under a two check system.  One check is paid to him
> for the expenses incurred by the truck (gas, tolls, etc.)
> The second check is paid to him to cover his wages for
> the trip and it is paid to him with taxes and Social
> Security taken out by the employer.  Thus wages would
> then appear under the employers name on his Social
> Security Report of Earnings.
>
> Since the pension contributions sent to us by J&J Cartage
> for Mr. Alampi for the years 1965 through 1971 are
> considered to be improper as no wages were reported by
> the company during these years to the Social Security
> Administration, he would not be eligible for a pension
> with our Fund.

(*Id.*)

**F.      Alampi Administratively Appeals the Fund's Denial of Benefits**

On January 11, 2006, Alampi administratively appealed the Fund's denial of his application for retirement benefits.  (*See id.* at 11-15, Pg. ID 1395-1399.)  In support of his appeal, Alampi argued, among other things, that he was paid under the "two check system."  (*Id.* at 12, Pg. ID 1396.)  This position was flatly inconsistent with Alampi's earlier response in the Questionnaire that he *did not* "receive separate checks for wages and equipment."  (ECF #12-3 at 18, Pg. ID 1311.)

On March 16, 2006, the Benefits Claims Appeal Committee (the "Appeal Committee"), in the first of a two-step administrative appeal process, considered and denied Alampi's appeal.  (*See* ECF #12-5 at 8, Pg. ID 1392.)  The Fund informed Alampi of this decision in a letter dated May 2, 2006.  (*See id.* at 6-7, Pg. ID 1390-1391.)  The Fund told Alampi that the contributions by J & J were not "proper" because Alampi was not a qualifying "employee" and did not "work[] under the terms of a collective bargaining agreement which required pension contributions on [his] behalf" at the time the contributions were made. (*Id.* at 6, Pg. ID 1390.)  The Fund explained that:

> [Your] Social Security Earnings Report indicates no
> wages reported on your behalf by J&J Cartage from
> 1965-1971.  As stated in the Fund's letter of August 12,

10

> 2005, as an owner-operator working under the terms of a
> Collective Bargaining Agreement, a Participant is paid
> under a two check system i.e. one check for truck
> expenses incurred and one check to cover the Participants
> wages, with taxes and Social Security payments deducted
> by the Employer.  Your Social Security Earnings Report
> only indicates that from 1965-1971, you received self-
> employment income.

(*Id.*)  Given the Fund's determination that Alampi was not an "employee" from 1965-1971, Alampi did not have sufficient credit to qualify for any pension benefits. (*See id.* at 6-7, Pg. ID 1390-1391.)

Alampi filed his second-step appeal to the Fund's Trustees on October 31, 2006.  (*See* ECF #12-3 at 23, Pg. ID 1316.)  In this appeal, Alampi argued that he was an employee of J & J during the years in question, that he should receive credit for his years at J & J, that the pension contributions J & J made on his behalf were proper, and that he was therefore entitled to pension benefits.  (*See id.* at 25-29, Pg. ID 1318-1322.)  Alampi also repeated his assertion "that he was paid on a two-check system" like other J & J employees (*id.* at 26, Pg. ID 1319),  even though he earlier told the Fund in the Questionnaire that J & J *did not* pay him with separate checks for wages and equipment.

The Fund set a January 2007 hearing date for Alampi's appeal.  It also sent Alampi correspondence in advance of this hearing requesting additional information related to his work at J & J.  (*See id.* at 13-15, Pg. ID 1306-1308.)  In this letter, the Fund told Alampi that he had not yet "submitted [any]

11

contemporaneously prepared documentation supporting his statement" that he was "paid in accordance with the two-check system during the years in question." (*Id.* at 14, Pg. ID 1307.)  The Fund also directed Alampi to numerous responses in the Questionnaire that "appear [] to conflict with [Alampi's] claim to have been an owner operator paid in accordance with the two-check system." (*Id.*)  The Fund then invited Alampi to "supplement his appeal submission with any information that he believes will [] explain what appear to be conflicting statements from him…" (*Id.* at 15, Pg. ID 1308.)

In response, Alampi submitted affidavits from employees of J & J – including Vice President Jack Russo, one of Alampi's superiors – who averred that Alampi was a "full-time employee" of J & J who was paid "in accordance with the two-check system." (*Id.* at 8-11, Pg. ID 1301-1304.)  Alampi did not, however, provide any additional explanation to resolve the discrepancies in the Questionnaire, nor did he provide any contemporaneous documentation from J & J that would establish his employee status.

## G.    The Trustees Consider and Deny Alampi's Appeal

The Fund's Trustees considered Alampi's appeal at their January 16, 2007 meeting.  Alampi appeared at the meeting and made a "personal presentation" to the Trustees.  (The Minutes at 7, Pg. ID 1300.)

12

The administrative record contains detailed minutes from the meeting.  (*See id.*)  According to the Minutes, the Trustees were first briefed on the background of Alampi's appeal, his request for benefits, and his years of correspondence with the Fund related to his request for benefits.  (*Id.* at 2-4, Pg. ID 1295-1297.)  Alampi's responses in the Questionnaire were then discussed in detail:

> In a letter dated November 19, 2004, staff requested Mr. Alampi to complete an Owner Operator questionnaire and requested that he submit contemporaneously prepared documents.  Mr. Alampi returned the completed questionnaire but failed to submit any contemporaneously prepared documentation.  His responses are listed below:
>
> 1) Mr. Alampi indicated that he was paid according to a percentage of revenue.
>
> 2) He indicated that he did not receive separate checks for wages and equipment.  [STAFF NOTE: The Collective Bargaining Agreement required the issuance of separate checks for wages and equipment rental.]
>
> 3) He indicated that the carrier (J&J Cartage) did not pay social security withholding tax.
>
> 4) He indicated that the pension contribution was taken out of his broker's check first and then paid to the union. [STAFF NOTE: The pension article of the Collective Bargaining Agreements specifically stated that there could be no deduction from equipment rental of owner-operators by virtue of the contributions to the Pension Fund.]
>
> 5) He indicated that he paid the hospitalization insurance. [STAFF NOTE: The pension article of the Collective Bargaining Agreements specifically stated that there

could be no deduction from equipment rental of owner-operators by virtue of the contributions to the Health and Welfare Fund.]

6) He indicated that the carriers did not withhold state and/or federal income tax from the driver's wages

7) He indicated that the carrier (J&J Cartage) paid workmen's compensation and unemployment compensation.

8) He indicated that he paid for fuel, maintenance, insurance, license fee, and traffic violations.

9) He indicated that he purchased his equipment from the carrier it was financed through the carrier, and the carrier retained title to the equipment until it was paid in full.

10) He indicated that the carrier allowed him to use the carrier's credit cards and line of credit for fuel, tires, and repairs.

11) He indicated that he operated under exclusive leases from 1961 through 1974, and the equipment was used exclusively for J&J Cartage.

12) He indicated that the equipment had pained on signed [sic] stating J&J Cartage.

13) He indicated that the carrier decided his reporting time, his hours, his vacation periods, and his routes.

14) He indicated that he never owned any operating authority.

(*Id.* at 4-5, Pg. ID 1297-1298.)

The Minutes then indicate that the Fund's staff had completed a detailed analysis of the affidavits Alampi submitted in support of his appeal. (*See id.* at 6-

14

7, Pg. ID 1299-1300.)   Staff found certain inconsistencies between some of the

statements in the affidavits and J & J's own records:

> Mr. Alampi's attorney submitted affidavits from J&J
> Cartage's former Vice-President and two co-workers who
> represented themselves as owner-operators of the
> company.  No contemporaneously prepared documents
> were submitted, nor did Mr. Alampi offer any
> explanation concerning his apparently conflicting
> statements and the parties' apparent failure to abide by
> the provisions of the Collective Bargaining Agreement.
> The Vice-President's affidavit states that Frank Alampi
> was employed with J&J Cartage, working full-time under
> the terms of the collective bargaining agreement, and
> paid in accordance with the two-check system for the
> years 1965 through 1971. He also stated that Mr. Alampi
> hauled only for J&J Cartage, and contributions were
> properly made on his behalf.
>
> The co-worker affidavit of Kenneth Nitchie indicates that
> he was also employed by J&J Cartage during the years
> 1965 through 1971. However, a check of the Fund's
> contribution records indicates J&J Cartage only paid
> contributions on behalf of Mr. Nitchie for the period of
> September 1970 through March 1972, and his pension
> application indicated that he only worked there from
> 1970 to 1972.  Mr. Nitchie states that he was paid in
> accordance with the two-check  system and so was
> Frank Alampi.
>
> The co-worker affidavit of Gerrit De Lanoy states that he
> was employed by J&J Cartage from 1964 through 1982.
> However, Fund contribution records indicate that J&J
> Cartage only paid contributions on his behalf for the
> period of 1965 through 1975, and his pension application
> listed employment with this company for the period of
> November 1964 to November 1974. Mr. Lanoy states
> that he was paid in accordance with the two-check
> system and so was Frank Alampi. The pension files of

15

> these retired co-workers do not contain earnings reports
> from the Social security Administration.

(*Id.*)

Following a "full discussion" by the Trustees of Alampi's appeal, "a motion was made, seconded and unanimously carried to reject and deny the request of Frank A. Alampi for Contributory Service Credit (and Vesting Service) in the period from 1965 through 1971 <u>and</u> for a Contribution-Based Pension, with said denial on the basis of the specific circumstances presented, including the facts and reasons cited in a letter to Mr. Alampi from William Topel dated May 2, 2006" (quoted above).  (*Id.*; emphasis in original.)

## H.   The Fund Sends Alampi a Formal Denial Letter

On January 23, 2007, the Fund wrote Alampi to advise him of the Trustees' decision to deny his appeal for benefits.  (*See* the "Denial Letter," ECF #12-7.) The Denial Letter began by referring Alampi to the provision in the Plan that defined the term "Employee."  (*Id.* at 1, Pg. ID 1478.)  The Denial Letter also restated the Plan's requirement that "[t]he common law test or the applicable statutory definition of master-servant relationship shall be used to decide any dispute regarding employee status."  (*Id.*)  The letter then summarized the evidence presented to the Trustees and explained the Trustees' decision that Alampi was not an "employee" of J & J; that his years of service with J & J did not qualify for

16

service credit under the Plan; and that he did not qualify for any pension benefits.

The Denial Letter, worth quoting at length, provided in relevant part as follows:

> In your Application for Retirement Pension Benefit, you indicated that you were employed by J&J Cartage from 1961 through 1974. Although this company was a Contributing Employer to the Pension Fund beginning in October 1964, the employer did not make contributions on your behalf until August 1965. In October 2003, you first raised your claim for Service Credit for your employment with this company for periods before August 1965. At that time, you submitted Employment Affidavits completed by Fred Alampi and Joseph J. Fabrizio, and you authorized the Pension Fund to obtain your earnings record from the Social Security Administration. *The report received from the Social Security Administration listed no wages reported on your behalf by J&J Cartage outside the period of 1972 through 1974, and it listed self-employment earnings for the period of 1963 through 1973. Based on this information, the Pension Fund questioned whether the contributions that J&J Cartage made on your behalf were proper.* In connection with the Fund's investigation, you completed an Owner Operator in Transportation Industry Questionnaire (copy attached). In your questionnaire responses you indicated that your compensation from J & J Cartage was based on a percentage of revenue. *You also indicated in your questionnaire response that you did not receive separate checks for wages and equipment, i.e., that you were not on the "two-check" system.* As explained in the Fund's letter of November 8, 2006…these responses, as well as many of your other responses, are not indicative of an Employee owner operator for whom pension contributions would not have been proper. *Your questionnaire responses are indicative of an independent contractor.*

17

In your appeals to the Benefits Claim Appeals Committee and the Trustees (and during your personal presentation to the Trustees), you stated that you were paid under the two-check system. In support of your appeal, you submitted your own affidavit and those of Jack Russo, Kenneth Nitchie, and Gerrit DeLaney – all stating that you were paid in accordance with the two check system. *However, you did not submit any contemporaneously prepared documentation supporting your current representation to have been paid in accordance with the two-check system, nor did you explain why you previously provided directly contrary information in your questionnaire response.*

A letter dated October 27, 2004 submitted on your behalf by your attorney, Mr. Matthew B. Theunick, states (on p. 3) that "[t]he possibility exists that while Mr. Alampi was working full-time for J&J Cartage from January 1, 1961 through August 1965, the J&J Cartage Company might not have been paying Mr. Alampi's social security contributions, nor his pension contributions as they should have been." Mr. Theunick is apparently suggesting that because management of J&J was found to have illegally coerced certain employees to pay contributions from their own wages to Teamster pension funds, "the possibility exists" that J&J management failed to report Mr. Alampi's Social Security wages and contributions to the federal government. *See US. v. Cusmano*, 729 F.2d 380 (6th Cir. 1984) (affirming conviction of owner of J & J Cartage for coercing certain employees to pay pension contributions out of their wages, in violation of the Hobbs Act). But Mr. Theunick has presented pure speculation on this point ("the possibility exists"), and the Cusmano case does not give any hint that J&J management under-reported or misreported Social Security wages earned by any J&J employee. *Moreover, during his personal appearance before the Trustee Appellate Review Committee on January 16, 2007, the Trustees asked Mr. Alampi to explain why he showed no Social Security wages as a*

18

*J&J employee for certain years during which he claims to have been in employee status with that company (and for which he reported self-employment income to the Social Security Administration). Mr. Alampi could not offer any explanation for this discrepancy*; therefore, there appears to be no support for the speculation advanced by Mr. Theunick.

*After careful review of all information in file*, the Trustees determined that you have not demonstrated that you were an Employee during your affiliation with J&J Cartage Company during the period of 1965 through 1971; and therefore, you are not eligible to receive Vesting Service or Contributory Service Credit based on the contributions made on your behalf by this company for this period. For the above stated reasons, the Trustees also determined that you have not demonstrated that J&J Cartage was required to make Employer Contributions on your behalf for the periods of October 1964 through July 1965 or August 1969 through May 1970. In addition, the Trustees determined that you are not eligible to receive Vesting Service or Non-Contributory Service based on your affiliation with J&J Cartage for periods before 1972 because you have not demonstrated that such affiliation constituted a period of employment (instead of self-employment).

The Trustees also considered your contention that the contributions made for the years 1965 through 1971 were reflected in the reports and correspondence sent to you by the Fund; and they considered your claim to have relied on those documents when preparing for your retirement. Therefore, please note that the reports and correspondence sent by the Fund contained the following statements, respectively:

"This is not a guarantee of benefits. The information listed on this report is subject to change based on further research and verification at the time of application for

19

benefits and is subject to all Articles of the Pension Plan."

"Details given are based on current information and pension plan provisions. Eligibility may change if we find additional or conflicting information or your employer discontinues its obligation to make pension contributions."

Please understand that Central States cannot control the date on which additional or conflicting information is received. In your case, the conflicting information was first discovered in 2004 because you waited until October 2003 to request the Fund to investigate your eligibility for additional Service Credit. *After careful review of all information in file, the Trustees determined that you were properly notified that the information in the reports and correspondence sent by the Fund was subject to verification and change.*

[….]

For all the reasons stated above, the Trustees denied your appeal.

(*Id.* at 2-5, Pg. ID 1479-1482; emphasis added.)

## PROCEDURAL HISTORY

On April 21, 2014, Alampi filed a one-count Complaint against Central States in the Macomb County Circuit Court. (*See* Compl., ECF #1-2 at 1-4, Pg. ID 8-11). In his Complaint, Alampi alleged that the Fund's "determination negating [his] Contributory Service Credit based on his Employment Status and determination that [he] did not qualify for pension benefits [were] in direct violation of the Plan." (*Id.* at ¶19.) Alampi thus sought to compel the Fund to

20

"provide [him] certain pension benefits" that the Fund had previously "promised" him.  (*Id.* at ¶1.)

The Fund removed the action to this Court on May 13, 2014.  (*See* Notice of Removal, ECF #1.)  The parties have now filed cross-motions for judgment as a matter of law on the question of whether the Fund improperly rejected Alampi's claim for pension benefits.  (*See* ECF ## 9, 10.)

## GOVERNING LEGAL STANDARD

In deciding the parties' motions, the Court may consider only the materials in the administrative record.  *See Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998) (concluding that district court's review of ERISA benefit dispute was limited "to the record that was before the Plan Administrator"). In addition, where, as here, "an ERISA plan provides the administrator [or Board of Trustees] with discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the Court cannot overturn a decision to deny benefits "unless that decision was arbitrary or capricious."  *Lewis v. Central States Southeast & Southwest Areas Pension Fund*, 484 Fed. App'x 7, 11 (6th Cir. 2012) (internal quotation marks omitted).

A decision to deny benefits "is not arbitrary or capacious if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence."  *Id.* (internal quotation marks omitted).  This standard "is the least

21

demanding form of judicial review of administrative action.  When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989).

## ANALYSIS

## A. The Trustees Did Not Apply an Improper Standard When Determining Whether Alampi Was an Employee Under the Plan

Alampi first argues that the Trustees' decision to deny him pension benefits was arbitrary or capricious because the Trustees failed to apply the proper standard for determining whether he was an "employee" of J & J. (*See* Alampi Brief, ECF #10 at 6, Pg. ID 847.)  Alampi's argument is as follows: (1) there was a dispute between he and the Fund concerning whether he was an "employee" of J & J during the relevant time period; (2) the Plan requires that "[t]he common law test … of master-servant relationship shall be used to decide any dispute regarding employee status" (the Plan at § 1.14(b), Pg. ID 1280); and (3) instead of applying the common-law test, the Trustees focused myopically on his social security earnings reports and method of payment. (Alampi Br. at 3, Pg. ID 844.)

In support of his argument, Alampi directs the Court to *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992).   In *Darden*, the Supreme Court set forth the common-law master-servant test that is incorporated into the Plan:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 323-324 (quoting *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-752 (1989)).[1]  Alampi insists that the Trustees deviated from the Plan – and thus acted arbitrarily or capriciously – because they failed to consider and/or address many of these factors. (*See* Alampi Br. at 6, Pg. ID 847.)  The Court disagrees.

While the Trustees could, perhaps, have used more precise language to make crystal clear that they were considering and applying all of the appropriate factors, Alampi has not shown that the Trustees failed to apply the correct factors.  On the contrary, there is evidence in the administrative record that the Trustees understood

---

[1] The Supreme Court in *Darden* was analyzing a question of ERISA standing, not whether a worker qualified as an "employee" under any particular pension plan. However, the Court resolved the ERISA standing question by applying the same common law test that is incorporated into the Plan here.

23

their obligation to apply the common-law factors and that they did apply those factors when making their decision.

For example, the Questionnaire that the Fund sent Alampi sought information on essentially all of the common-law factors. (*See* ECF #12-3 at 16-22, pg. ID 1309-1315.) Among other things, the Questionnaire asked Alampi about the "source of the instrumentalities and tools … the duration of the relationship between the parties; whether [J & J had] the right to assign additional projects to [Alampi]; the extent of the [Alampi's] discretion over when and how long to work; the method of payment[;] … the provision of employee benefits; and the tax treatment of the hired party." *Darden*, 503 U.S. at 323-324. Then, when the Trustees considered Alampi's appeal, they reviewed and considered Alampi's responses in the Questionnaire that tracked the common-law factors. (*See* the Minutes at 3-4, Pg. ID 1297-1298.) Finally, the Denial Letter expressly recognized that "[t]he common law test … of master-servant relationship shall be used to decide any dispute regarding employee status." (Denial Letter at 1, Pg. ID 1478.) The Denial Letter also informed Alampi that the Trustees' applied this test when they reviewed "all information" that was included in his file (*id.* at 3, Pg. ID 1480) – information that included documents and correspondence discussing the various common-law factors. On this record, the Court cannot conclude that the Trustees'

failed to apply the proper common-law standard when determining whether Alampi was an "employee" under the terms of the Plan.

## B.     The Trustees' Substantive Decision that Alampi Was Not an "Employee" of J&J Was Not Arbitrary or Capricious

Alampi argues in the alternative that even if the Trustees applied the appropriate common-law factors, their conclusion that he was not an "employee" is nonetheless arbitrary or capricious. Alampi insists that no reasonable person could possibly find that Alampi was anything other than an "employee" under the common-law test. (*See* Alampi Br. at 8, Pg. ID 849.) Again, the Court disagrees.

While some of the common law factors arguably support Alampi's claim that he was an "employee" of J & J, the Trustees' decision that Alampi was a self-employed, independent contractor is supported by other evidence in the record. Indeed, Alampi's Social Security records, the fact that he paid taxes as if he was self-employed during the years in question, and the fact that Alampi, himself, indicated on the Questionnaire that he was paid under the "one-check" system, all support a finding that Alampi was not an "employee" of J & J during the years in question. Because the Trustees' decision is based upon competent evidence, it is neither arbitrary nor capricious. *See, e.g., Lewis*, 484 Fed. App'x at 11.

And the Trustees' decision is no less sound because they rejected (1) Alampi's belated claim that he was, in fact, paid under the two-check system and (2) the assertions in Alampi's supporting affidavits that he was paid under that

system and was thus a J & J "employee" during the years in question.  Indeed, Alampi told two conflicting stories concerning how he was paid, and it was not arbitrary or capricious for the Trustees to either credit his first story (that he was paid under the one-check system) over his second story (that he was paid under the two-check system) or to disregard his statements entirely on the ground that they were fundamentally inconsistent.  Likewise, the review of Alampi's affidavits by Fund's staff gave the Trustees reason to doubt the veracity and/or accuracy of Alampi's affiants, and thus the Trustees did not act arbitrarily or capriciously in reaching a conclusion contrary to the one urged by the affiants.

None of this is to say that the Court necessarily agrees with the Trustees' determination or that the determination is so obviously correct as to be immune from reasonable disagreement.  But the standard of review here is for an abuse of discretion – "the least demanding form of judicial review of administrative action," *Davis*, 887 F.2d at 693 – and the Court simply cannot conclude that the Trustees abused their discretion when they determined that Alampi was not an "employee" of J & J during the years in question and that he therefore lacked the requisite number of service credits to qualify for any pension benefits.

The United States Court of Appeals for the Tenth Circuit reached the same conclusion under very similar facts in *Carter v. Central States Southeast and Southwest Areas Pension Plan*, 656 F.2d 575 (10th Cir. 1981).  In that case, the

Tenth Circuit held that a plan administrator did not act arbitrarily where it determined that a claimant was not an "employee" and where it based that determination, in part, on "the Social Security Administration's records of wages paid in plaintiff's behalf as an employee." *Id.* at 577. The court noted that the administrative record contained evidence that could have supported either a finding that the claimant was or was not an employee: "no social security or income tax was withheld by [the purported employer] on [the] plaintiff's behalf[,] … [the] plaintiff was paid a percentage of the revenue[,] … [but the] plaintiff's trailer bore [the purported employer's] emblem, [and the] plaintiff was subject to [the purported employer's] authority with respect to hiring, firing, and discipline." (*Id.* at 577.) The court acknowledged that the relationship between the claimant and the company for which he worked was "neither pure employee-employer nor pure independent contractor" and that "we might, as an original trier of fact, have decided that plaintiff was [an] employee," but the court stressed that "our standard of review requires us to be markedly more deferential to [and not to disturb] defendants' determination" that the plaintiff was an independent contractor. *Id.* at 578. As in *Carter*, the Trustees' decision here that Alampi was an independent contractor for J & J cannot be deemed arbitrary or capricious simply because there may have been sufficient evidence in the record to support the opposite conclusion.

**C.     Alampi is Not Entitled to Benefits on an Equitable Estoppel-Like Theory**

Alampi finally argues[2] in his motion that even if the Trustees' decision to deny his appeal and deny him benefits was not arbitrary or capricious, he nevertheless is still entitled to benefits because he "reasonably relied" on the Fund's repeated statements that he had earned 14.3 years of service credit and therefore qualified for a "Vested Pension." (*See* Alampi Br. at 11, Pg. ID 852.)  As explained in the Denial Letter, the Trustees considered this argument and rejected it.  (*See* Denial Letter at 3-4, Pg. ID 1480-1481.)  Alampi has provided no basis – aside from repeating the same arguments the Court has rejected above – to disturb this decision.

Alampi's argument fails in two other respects.  First, when the Fund told Alampi that he had earned 14.3 years of service credit and qualified for a pension, it also told him that this assessment was based on "current information" and that his "eligibility" for a pension could "change if [the Fund found] additional or conflicting information." (*See, e.g.,* ECF #12-6 at 34-42, Pg. ID 1463-1471.)  That is exactly what happened: The Fund learned of additional information that, in its

---

[2] Alampi also argues, in a one-paragraph section of his brief that contains no citation to the administrative record or to any authority, that the first-step of his administrative appeal in January 2006 was not decided in a timely manner and that the Fund's tardiness entitles him to relief.  (*See* Alampi Br. at 10, Pg. ID 851.)  However, Alampi's argument in this regard is wholly undeveloped, and Alampi has failed to show any entitlement to relief on this theory.

view, disqualified Alampi from receiving pension benefits, and the Fund changed Alampi's eligibility status. On this record, the Court sees no basis to estop the Fund from doing precisely what it told Alampi it reserved the right to do.

Second, Alampi does not cite any authority for the proposition that he may invoke an estoppel-like theory here. Alampi has not attempted to show how his case fits within the test for equitable estoppel in the ERISA context as set forth in Sixth Circuit decisions such as *Marks v. Newcourt Credit Grp., Inc.,* 342 F.3d 444, 456 (6th Cir. 2003) and *Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 403 (6th Cir. 1998) (en banc). Alampi is not entitled to relief under a reliance or equitable estoppel-like theory.

## **CONCLUSION**

For all the reasons stated above, the Court **GRANTS** the Fund's Motion for Judgment on the Administrative Record (ECF #9) and denies Alampi's Motion for Summary Judgment (ECF #10).

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: December 3, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on December 3, 2014, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113

29